Citation Nr: 1710378 
Decision Date: 03/31/17 Archive Date: 04/11/17

DOCKET NO. 05-11 212 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Winston-Salem, North Carolina


THE ISSUES

1. Entitlement to a disability rating in excess of 20 percent, prior to March 9, 2012, and in excess of 40 percent thereafter, for service-connected lumbar strain. 

2. Entitlement to a total disability evaluation based on individual unemployability as due to service-connected disabilities (TDIU).


REPRESENTATION

Veteran represented by: D. Krasnegor, Esq.


ATTORNEY FOR THE BOARD

R. Dodd, Counsel



INTRODUCTION

The Veteran had active service from May 1978 to October 1982. 

This matter comes before the Board of Veterans' Appeals (Board) on appeal from a February 1991 rating decision by a Department of Veterans Affairs (VA) Regional Office (RO). 

The claims were denied by the Board in September 2008, and the Veteran appealed to the U.S. Court of Appeals for Veterans Claims (Court). Pursuant to an April 2010 joint motion for remand between the Secretary of Veterans Affairs (Secretary) and counsel for the Veteran, the Court vacated the Board's decision and remanded the claims. 

The claims were previously before the Board and remanded in October 2014, November 2015, and December 2016 for additional development. The requested development having been completed, this claim is once again before the Board.


FINDINGS OF FACT

1. The probative evidence of record shows that the Veteran's lumbar strain prior to March 9, 2012, resulted in a moderate condition with flexion of the thoracolumbar spine greater than 30 degrees but not greater than 60 degrees, with loss of lateral motion, but no showing of ankylosis, associated arthritis, or associated incapacitating episodes.

2. The probative evidence of record shows that the Veteran's low back disability from March 9, 2012, resulted in forward flexion of the thoracolumbar spine of less than 30 degrees and severe lumbar strain, with loss of lateral motion, but no showing of ankylosis, associated arthritis, or incapacitating episodes.

3. The evidence of record does not show that the Veteran is unable to secure or follow a substantially gainful occupation as a result of her service-connected disabilities, given her educational background and occupational experience.


CONCLUSIONS OF LAW

1. The criteria for a disability rating in excess of 20 percent prior to March 9, 2012, and in excess of 40 percent thereafter, for service-connected low back disability are not met. 38 U.S.C.A. § 1155, 5103(a), 5103A, 5107(b) (West 2014); 38 C.F.R. § 3.102, 3.159, 4.45, 4.59, 4.71a, Diagnostic Code 5237 (2016); 38 C.F.R. § 4.71a, Diagnostic Codes 5292, 5295 (2002).

2. The criteria for a total disability rating based on individual unemployability due to service-connected disability have not been met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 3.102, 3.340, 3.341, 4.3, 4.15, 4.16, 4.19 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Notify and Assist

VA has a duty to notify the Veteran of the information and evidence necessary to substantiate the claims submitted, the division of responsibilities in obtaining evidence, and assistance in developing evidence, pursuant to 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b). This duty has been met in a letter sent to the Veteran in September 2003 and March 2006 which apprised her of her and VA's duties.

Additionally, all relevant facts have been properly developed, and all evidence necessary for equitable resolution of the issue resolved in this decision is of record. The Veteran's service treatment records, VA medical records, and private medical records have been obtained. 

The duty to assist also includes making as many requests as are necessary to obtain relevant records from a Federal department or agency, including, but not limited to, VA medical records and relevant social security administration (SSA) records. 38 C.F.R. § 3.159(c)(2); Golz v. Shinseki, 590 F.3d 1317, 1321-23 (Fed. Cir. 2010). The record indicates that the Veteran was in receipt of SSA benefits and such records have been associated with the claims file and reviewed accordingly.

In addition, the Veteran was afforded multiple VA joints examinations. The Board has reviewed the examination reports and finds that they are adequate because the examiners reviewed the claims file; discussed the Veteran's pertinent medical history and current complaints; clinically examined the Veteran, reported all findings in detail; and provided detailed rationale in support of their determinations. See Barr v. Nicholson, 21 Vet. App. 303, 312 (2007); Stefl v. Nicholson, 21 Vet. App. 120, 124-25 (2007) (holding that an examination is considered adequate when it is based on consideration of the veteran's prior medical history and examinations and also describes the disability in sufficient detail so that the Board's evaluation of the disability will be a fully informed one). 

Although it is noted that a new precedential opinion that potentially implicated this case was issued by the United States Court of Appeals for Veterans Claims (Court), the Board finds that the concerns addressed in that decision are not applicable to the instant facts. In Correia v. McDonald, 28 Vet. App. 158 (2016), the Court held that the final sentence of 38 C.F.R. § 4.59 creates a requirement that certain range of motion testing be conducted whenever possible in cases of joint disabilities. The final sentence provides that "[t]he joints involved should be tested for pain on both active and passive motion, in weight-bearing and nonweight-bearing and, if possible, with the range of the opposite undamaged joint." The Court found that, to be adequate, a VA examination of the joints must, wherever possible, include the results of the range of motion testing described in the final sentence of § 4.59. However, in the instant case, it is noted that the Veteran's lumbar spine, which is currently evaluated at 40 percent disabling since March 9, 2012, is already afforded the highest available rating based upon range of motion. In order to achieve any higher evaluations for that condition, the Veteran would have to show the presence of ankylosis. As such, any additional range of motion testing would be merely cumulative and redundant, as such findings could not be used to show how the Veteran is entitled to any higher evaluation for her lumbar strain based upon range of motion alone. Additionally, for the period prior to March 9, 2012, any further contemporaneous range of motion testing would not be sufficiently indicative of the Veteran's range of motion in the past. Therefore, any further examination to be conducted in accordance with the Court's finding in Correia is rendered moot under the particulars of this case.

In sum, the Veteran was provided with a meaningful opportunity to participate in the development of the claim decided below, and she has done so. Accordingly, the Board concludes that all reasonable efforts have been made by VA to obtain evidence necessary to substantiate the claim resolved in this decision, and no further assistance is required. See Pelegrini v. Principi (Pelegrini II), 18 Vet. App. 112, 120-21 (2004); Conway v. Principi, 353 F.3d 1369, 1374 (Fed. Cir. 2004); Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006); see also ATD Corp. v. Lydall, Inc., 159 F.3d 534, 549 (Fed. Cir. 1998). 

A review of the claims file shows that there has been substantial compliance with the Board's prior remand directives. See Stegall v. West, 11 Vet. App. 268 (1998); see also Dyment v. West, 13 Vet. App. 141 (1999) (holding that another remand is not required under Stegall where the Board's remand instructions were substantially complied with), aff'd, Dyment v. Principi, 287 F.3d 1377 (2002).

Legal Criteria

Increased Ratings

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities (Schedule), found in 38 C.F.R. Part 4 (2016). The Schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The ratings are intended to compensate, as far as can practicably be determined, the average impairment of earning capacity resulting from such diseases and injuries and their residual conditions in civilian occupations. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1 (2016).

In considering the severity of a disability, it is essential to trace the medical history of the veteran. 38 C.F.R. §§ 4.1, 4.2, 4.41 (2016). Consideration of the whole-recorded history is necessary so that a rating may accurately reflect the elements of any disability present. 38 C.F.R. § 4.2; Peyton v. Derwinski, 1 Vet. App. 282 (1991). Although the regulations do not give past medical reports precedence over current findings, the Board is to consider the veteran's medical history in determining the applicability of a higher rating for the entire period in which the appeal has been pending. Powell v. West, 13 Vet. App. 31, 34 (1999). 

Disability of the musculoskeletal system is primarily the inability, due to damage or infection in the parts of the system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination, and endurance. It is essential that the examination on which ratings are based adequately portrays the anatomical damage and the functional loss with respect to all of these elements. In evaluating disabilities of the musculoskeletal system, it is necessary to consider, along with the schedular criteria, functional loss due to flare-ups of pain, fatigability, incoordination, pain on movement, and weakness. DeLuca v. Brown, 
8 Vet. App. 202 (1995). 

The functional loss may be due to absence of part, or all, of the necessary bones, joints and muscles, or associated innervation, or other pathology and evidenced by visible behavior of the claimant undertaking the motion. Weakness is as important as limitation of motion, and a part that becomes painful on use must be regarded as seriously disabled. 38 C.F.R. § 4.40 (2016). Pain on movement, swelling, deformity, or atrophy of disuse as well as instability of station, disturbance of locomotion, interference with sitting, standing, and weight bearing are relevant considerations for determination of joint disabilities. 38 C.F.R. § 4.45 (2016). Painful, unstable, or malaligned joints, due to healed injury, are entitled to at least the minimal compensable rating for the joint. 38 C.F.R. § 4.59 (2016); Burton v. Shinseki, 25 Vet. App. 1 (2011) (holding that 38 C.F.R. § 4.59 applies to disabilities other than arthritis). However, painful motion alone is not a functional loss without some restriction of the normal working movements of the body. Mitchell v. Shinseki, 25 Vet. App. 32, 43 (2011).

Where there is a question as to which of two evaluations shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7.

TDIU

Total disability ratings for compensation based on individual unemployability may be assigned where the schedular rating is less than total, when it is found that the disabled person is unable to secure or follow a substantially gainful occupation as a result of a single service-connected disability ratable at 60 percent or more, or as a result of two or more disabilities, provided at least one disability is ratable at 40 percent or more, and there is sufficient additional service-connected disability to bring the combined rating to 70 percent or more. For the purpose of determining one 60 percent disability, disabilities resulting from a common etiology or a single accident are considered as one disability. 38 C.F.R. §§ 3.340, 3.34l, 4.16(a). 

Where these percentage requirements are not met, entitlement to the benefits on an extraschedular basis may be considered when the veteran is unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities. 38 C.F.R. §§ 3.321(b), 4.16(b). 

In determining whether an individual is unemployable by reason of service-connected disabilities, consideration must be given to the type of employment for which the veteran would be qualified. Such consideration would include education and occupational experience. Age may not be considered a factor. 38 C.F.R. § 3.341. Unemployability associated with advancing age or intercurrent disability may not be used as a basis for assignment of a total disability rating. 38 C.F.R. § 4.19.

In making all determinations, the Board must fully consider the lay assertions of record. A layperson is competent to report on the onset and recurrent symptoms. See Layno v. Brown, 6 Vet. App. 465, 470 (1994) (a Veteran is competent to report on that of which he or she has personal knowledge). Lay evidence can also be competent and sufficient evidence of a diagnosis or to establish etiology if (1) the layperson is competent to identify the medical condition, (2) the layperson is reporting a contemporaneous medical diagnosis, or (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional. Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed. Cir. 2009); Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007). When considering whether lay evidence is competent the Board must determine, on a case by case basis, whether the Veteran's particular disability is the type of disability for which lay evidence may be competent. Kahana v. Shinseki, 24 Vet. App. 428 (2011); see also Jandreau v. Nicholson, 492 F.3d at 1377 (Fed. Cir. 2007) (holding that "[w]hether lay evidence is competent and sufficient in a particular case is a factual issue to be addressed by the Board").

The claimant bears the burden of presenting and supporting his/her claim for benefits. 38 U.S.C.A. § 5107(a). See Fagan v. Shinseki, 573 F.3d 1282 (Fed. Cir. 2009). In its evaluation, the Board shall consider all information and lay and medical evidence of record. 38 U.S.C.A. § 5107(b). When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Board shall give the benefit of the doubt to the claimant. Id. The benefit of the doubt doctrine is not applicable based on pure speculation or remote possibility. See 38 C.F.R. § 3.102.

Analysis

Lumbar Strain

The Veteran contends that her current evaluations of 20 percent prior to March 9, 2012, and 40 percent thereafter, inadequately reflect the severity of her disability.

The Veteran filed her claim for an increased evaluation in October 1990.

Prior to March 9, 2012

The Board notes that service connection was established for chronic low back muscular strain by a December 1987 rating decision. 

In March 1990 treatment records, the Veteran gave a 12 year history of low back pain beginning with an injury she sustained in service. She was discharged with a service-connected disability and had not held a steady job since then. She was in a vocational rehabilitation program through the VA, attempting job retraining, but she did not feel she could continue since she could only stand from about 8:30 in the morning until noon because of pain. The only relief was with sitting down or in a lying position. She was taking Motrin and some muscle relaxants. Objective evidence indicated she moved very slowly, had a flat affect, and continued to relate difficulties with work and inability to deal with rehabilitation. 

Examination of her back indicated it was very tender to even the lightest touch of the skin. This area of pain extended from the first thoracic vertebrae down to the coccyx. However, the doctor could detect no palpable muscle spasm. The Veteran was able to hop and bounce on either foot and could flex to 85 degrees and extend less than 5 degrees. She could bend to the left and right 30 degrees, there was no lower extremity weakness, and deep tendon reflexes were full and equal. X-rays were normal. The doctor's assessment was of chronic low back pain with no obvious etiology, apparently associated with deconditioning. He recommended a home gymnastic general conditioning program, back flexion and extension exercises, and to discontinue all medications until further advised.

Evidence from the SSA showed that in 1996 the Veteran was deemed unemployable for Supplemental Security Income purposes as of June 1990 due to mental health disorders to include dysthymic disorder and somatization disorders; further she was specifically deemed as not having a severe musculoskeletal impairment, specifically contemplating a back disability. 

In October 1990 treatment records, the Veteran claimed that her back condition got worse daily and that she could not keep a job. Her gait was normal. She could acceptably walk on her heels and toes. There was some tenderness over the back to light pressure. Additionally, the Veteran indicated that she had pain in the back with motion in all directions. No muscle spasms were noted. Straight leg raising test was negative. The examiner found no evidence of any radiculopathy and did not show that there was any limitation of motion.

The Veteran was provided with a VA examination in March 1994. She showed subjective complaints of pain and paresthesias in the lower extremities aggravated by riding, sitting, standing, and bending. There was no bowel or bladder difficulty. Objective findings show flexion to 60 degrees and full lateral flexion and rotation, and straight leg raising is to 60 degrees. There was good range of motion about the hips. X-ray did not show osteoarthritic change of the lumbosacral spine. Neurology consult showed normal reflex study. Motor exam was difficult because the Veteran was not in full cooperation. The examiner diagnosed lumbar strain, with low back pain, and no evidence of neurological abnormality or radiculopathy.

The Veteran was provided with an additional VA examination in November 1995. She showed subjective complaints of midline lumbosacral pain with some numbness of the arms and legs not resolved with transcutaneous electrical nerve stimulation (TENS) or medications. She took Advil daily. She stood erect, all movements were performed slowly. There was full range of motion of the cervical spine and the upper extremities. There was no paraspinal muscle spasm or tenderness. She could stand on tiptoes and on either leg. She could squat, but recovered slowly. Flexion was to 85 degrees (of 90) and there was normal flattening of the lumbar spine. There was no fixed deformity. The musculature of the back was soft and non-tender. Extension was 10 degrees, lateral flexion to 20 degrees, and rotation to 15 degrees bilaterally. Straight leg raising was full with no evidence of pain. X rays of the lumbosacral spine were normal in 1990 and she refused current x ray. Examiner diagnosed chronic low back pain, which was nonorganic in nature. An x ray completed in March 1994 shows straightening of the normal lordotic curve. The lumbosacral spine was otherwise normal.

The Veteran was provided with a VA Social and Industrial Survey in January 1996. She was unemployed and last worked in 1985 in a department store. She reported being unable to maintain employment due to her back. She reported seeing many doctors who say there was nothing that could be done for the back pain. She used Paxil and Oxaprozin for pain and depression. She has severe economic difficulties and receives no support from her family. She was divorced and receives no assistance. She had a son and received some assistance from the local community. During the interview she reportedly had to get up several times due to back pain. She says she was not able to drive due to back pain. She was depressed over her financial situation and has psychosocial stressors which impacted her existing medical problems.

A September 2004 magnetic resonance imaging (MRI) report indicates that the veteran's vertebral bodies were normal in height and alignment and disc spaces were normal. There was no spondylosis or spondylolisthesis noted. There were no lytic or blastic lesions or fractures seen. The conclusion was that there was no evidence of fracture or subluxation. 

A January 2005 MRI report indicates that there were no fractures indicated; alignment was normal; disc spaces were maintained; tiny marginal osteophytes were noted; and there were no signs of facet arthropathy. The impression was one of minimal spurring. 

During April 2005, the Veteran was afforded a VA examination. The examiner indicated that the Veteran complained of constant pain for the last twenty-five years which traveled to the hands, legs and back. The characteristic of the pain was burning, sharp, sticking and cramping at 7 out of 10. The pain was relieved by rest and medication. At the time of pain, the Veteran reported she could function with medication and that the condition did not cause incapacitation. She reported her functional impairment as pain with prolonged standing and walking. She reported she had lost no time from work due to the condition. The Veteran's posture was normal; however, her gait was short and shuffling. 

On objective examination of the thoracolumbar spine, there was no complaint of radiating pain on movement with absent muscle spasm. There was tenderness noted in all areas palpated, including those remote and far from her back. The Veteran was reported as having grimacing and withdrawal pain with even the lightest palpitation. There were negative straight leg raises on both the right and left. There was no ankylosis. Range of motion was reported as 0 to 90 degrees of flexion with pain occurring at 60 degrees; and 0 to 30 degrees of extension, right lateral flexion, left lateral flexion, left rotation and right rotation with pain occurring at 20 degrees. Range of motion was additionally limited by pain after repetitive use but was not additionally limited after repetitive use by fatigue, weakness, lack of endurance, or incoordination. 

The examiner indicated there were no signs of intervertebral disc syndrome with chronic permanent nerve root involvement. Neurological, sensory and motor function were reported as being within normal limits; both right and left lower extremity reflexes were 2+ in the knee jerk and ankle jerk. Lumbar spine x-rays were reported as being within normal limits. The examiner indicated the Veteran exhibited several positives on the Waddell's test to include collapse with light cranial tap; also indicating she showed grimacing withdrawal with all superficial light palpitation to include areas remote from her back. Additionally, she was described as being able to exhibit a full range of motion and held bent and fixed positions for extended periods of time while the pain passed. 

The examiner reported that after the Veteran completed the range of motion testing, she was unable to climb on the examination table, but instead sat on the examination table stool and lightly sobbed from the pain. However, the Veteran was able to disrobe, put her shoes and socks on and walk comfortably and smoothly without the amount of discomfort exhibited during her physical examination. The examiner, in conclusion, indicated that the Veteran's subjective complaints of pain in her arms, legs and up and down her back could not be ascribed to her service-connected lower back disability as the pain did not follow a physiologic neurological pattern. He additionally indicated that the level of pain complained of during her examination was inconsistent with other activities she was observed as doing, to include rising from a chair and putting on her shoes and socks, performed effortlessly and without grimace. The radiological consultation performed in connection with the VA examination was negative, showing good alignment throughout with disc spaces preserved, and vertebral body height was maintained with normal joints. 

Medical treatment records from Albemarle Hospital indicate the Veteran received rehabilitation therapy during May and June 2005 for her lower back disability. A May 2005 treatment record from Dr. K. indicates that the Veteran was complaining of her left side going to sleep and pins and needles in her left lower extremity. Reflexes were reported as symmetric and normal and sensation was reported as intact. There was a negative straight leg raise bilaterally. There was weakness in all motor groups; however, the examiner observed that there was absolutely no effort with attempts to increase strength on objective strength testing. Also, the Veteran was reported as being very hypersensitive about pain in the lower extremities. The examiner indicated full flexion and extension were present. Also, x-rays of the lumbar spine appeared to be normal. 

A June 2005 treatment record from Dr. K. indicates that the Veteran had pain which was aggravated by prolonged standing, squatting, bending and stooping. The examiner indicated the Veteran ambulated with a normal gait and had excellent balance, getting on the examination table with minimal difficulty. Neurologically, all motors in the upper and lower extremities were graded at a firm 5/5. There was a negative straight leg raise bilaterally. The examiner indicated that his best guest, after viewing the MRI report was that she had some radicular component secondary to lumbar spondylitis. The June 2005 MRI report indicates that there was a small posterior herniated nucleus pulposus to the left of the midline at the L5-S1 level which appeared to be causing at least mild mass effect on the left S1 nerve root and the ventral surface of the thecal sac. There were hypertrophied facets at the L5-S1 level although there did not appear to be significant neural foraminal encroachment. 

A September 2005 new patient evaluation with Dr. L.M. indicated that the Veteran had good gait and station with good range of motion of the lumbar spine. Straight leg raises were to 85-90 degrees bilaterally. Dr. L.M. recommended to the Veteran that she should be able to work on a regular basis. It was noted the Veteran had been involved in a motor vehicle accident in September 2004 in which she was rear-ended. The examiner indicated that x-rays of the lumbar spine revealed the intervertebral disc spaces were maintained with no signs of arthritis. 

A January 2006 letter from Dr. K.M., a neurologist, indicates that the Veteran reported she was unable to stand or sit for a long period of time and could not easily rise from a chair because of her back pain of the cervical, thoracic and lumbar spine. On objective examination, motor examination was characterized by giveaway weakness in all four extremities. Attempts to palpitate the cervical, thoracic and lumbar spine were reported as bringing the Veteran nearly to her knees because of sensitivity of the entire spine to minimal palpitation. The examiner reported mincing steps while ambulating with a limp on the left. Sensory examination was significant for a marked diminishment in the ability to appreciate all sensory modalities in the left face, left arm and left leg. However, the Veteran was reported as having joint position sense preserved and being able to manipulate a fine object in the hand without difficulty. The Veteran was unable to perform graphesthesia and could not appreciate touch on the left. Reflexes were reported as 2/5 and symmetric to include the lower extremities bilaterally. The examiner's impression was that the diffuse entire spinal column pain could not be related to the MRI finding of a small left L5/S1 herniated disc which touched the S1 root. The Veteran was reported as being so lacking in sensation in the left lower extremity and so weak in all muscle territories throughout that the examiner could not find a radicular defect. However, reflexes were preserved. The examiner indicated that the Veteran's examination was consistent with embellishment to include a disproportionate of manual versus observed motor behaviors. The examiner also indicated that the left hemi-sensory deficit may reflect a lacunar stroke, although the examiner indicated that this deficit also appeared embellished. 

An MRI dated October 2006 indicates that the Veteran had a motor vehicle accident the day before. There was no fracture identified. There was some straightening of the lumbar lordosis; alignment was otherwise normal. Disc spaces were decreased at L1-L2 and L2-L3 with other disc spaces maintained. There were small marginal osteophytes seen in the lumbar spine. There was no facet arthropathy. The clinician's impression was mild degenerative change with no acute abnormality. A physical evaluation conducted because of the same accident by Dr. S.M. indicates that the veteran had range of motion to 45 degrees flexion; 20 degrees on extension, left lateral flexion and right lateral flexion; with left and right rotation to 30 degrees. 

Treatment records in October 2009 showed a recommendation for conservative management to include physical therapy back brace and TENS unit and possible epidural injections. There was no improvement with these recommendations. 

Records in 2010 also show that no improvement was made with conservative treatment methods and epidural injections that were provided.

The Veteran was provided with an additional VA examination on June 2011. The examination showed that the Veteran reported an initial injury to the back during military service picking up boxes and was diagnosed as having lumbar strain. The Veteran stated that she continued to have light intermittent back pain during the rest of her military career and for 3 to 4 years after her discharge from active duty. The Veteran stated that she now had severe flare ups weekly and have undergone injections in the past, which did not help at all. She stated that her lower back pain had progressively worsened and that she now takes Hydrocodone and Oxycodone for pain with fair response. The Veteran further said that she was barely able to take care of herself during severe flare ups of lower back pain. She denied any associated bowel or bladder dysfunction. She reported fatigue, stiffness, weakness, spasms, decreased motion, and pain in the lower back that starts shortly after weight bearing. She was in constant pain. Pain was described as moderate, throbbing, radiating up the back when very bad with tightness. 

Physical examination showed her posture to be stooped, but head position was normal. Gait was moderately antalgic with poor propulsion and using a cane for balance. There was no evidence of spinal deformity, abnormality, or ankylosis demonstrated. There was muscle spasm guarding of movement, pain with motion, weakness and tenderness of the thoracolumbar spine with muscle spasm, localized tenderness, and guarding severe enough to result in abnormal gait. Range of motion showed normal flexion of 90 degrees with normal extension of 30 degrees. There was limitation with bilateral lateral flexions of 20 degrees left rotation of 20 degrees and right rotation of 10 degrees due to pain. The combined range of motion was limited to 190 degrees. Repetitive motions caused increased pain resulting m additional loss of motion with flexion limited to 70 degrees and extension limited to 20 degrees with no change in range of motion with bilateral lateral flexions or rotations. The combined range of motion after repetitive movements was limited to 160 degrees. There was no objective evidence of decreased sensations of the bilateral lower extremities. Motor function and deep tendon reflexes were also normal in the bilateral lower extremities. Lasegue's sign was negative, but Waddell's sign and axial compression were positive for mild hyperbole (exaggerated statement or strong emotional response). There was marked weakness of the lumbar muscles with use of hand on legs and furniture to facilitate movement. Lumbar spine x rays showed stable degenerative disc disease. There was no evidence of intervertebral disc disease or permanent nerve root damage shown. Diagnosis was made as degenerative disc disease of lumbar spine without radiculopathy.

The VA examiner stated that the Veteran was currently not working and reported that some days she has difficulty with self-care in the house due to back pain. Problems associated with her lumbar spine disability were reported as lifting and carrying lack of stamina, weakness or fatigue, and pain. The examiner also stated that the Veteran has constant back pain, using the hands on the legs and furniture for flexion and lateral bending . The Veteran also complained of pain throughout the examination, but particularly on flexion beyond 60 degrees. He stated that there were no neurologic findings noted or additional orthopedic findings demonstrated and no evidence of intervertebral disc syndrome or radiculopathy found. The VA examiner reviewed all evidence of record and stated that there was also evidence of the Veteran being in two motor vehicle accidents since her discharge from military service. Therefore, it was not possible to separate the back pain due to the incident in service and that which may have been due to the motor vehicle accidents.

VA Vocational Rehabilitation records showed that the Veteran applied for Vocational Rehabilitation training in 1988. VA determined that the service connected back disability materially contributed to her employment impairment, but that it was not considered a serious employment handicap. Records showed that the Veteran was approved and entered training in 1988, but she discontinued her training in September 1988. However she resumed training in 1989 and extension was granted. The Veteran again discontinued training in December 1989. Records show that she reapplied and entered workshop training again from February 1990 to May 1990. Reports show that she moved and in 1991 she was interested in continuing her training. In 1992 she again underwent counseling and was found to be acceptable for training, however no further pursuits were shown until February 2005, at which time she re-applied for benefits. However her Vocational Rehabilitation claim was disallowed because on April 2005 she informed VA that she wished to withdraw her application. She had not worked since 1995 and her medical conditions kept her from working a full-time job. VA personnel explained to her that the purpose of the program was full-time employment and it must be feasible that she could return to full-time work, but she indicated that this was not possible at that time.

Prior to March 9, 2012, the claims folder contains no other evidence of range of motion testing of the Veteran's lumbar spine. The Board notes that the claims folder also contains various private treatment records; however, such treatment records relate only to the Veteran's complaints of low back pain generally, without discussion of range of motion or other symptoms. 

At the outset, the Board notes that the schedular criteria for rating the spine were amended during the appeal period. Effective September 26, 2003, the rating criteria for evaluating other spine disorders were amended. See 68 Fed. Reg. 51,454-51,458 (August 27, 2003); see also corrections at 69 Fed. Reg. 32, 449 (June 10, 2004).

Where the law or regulation changes after a claim has been filed or reopened but before the administrative or judicial appeal process has been concluded, the version most favorable to the veteran applies, absent congressional or Secretarial intent to the contrary. See Dudnick v. Brown, 10 Vet. App. 79 (1997). The amended versions may only be applied as of their effective date and, before that time, only the former version of the regulation should be applied. VAOPGCPREC 3-2000; 65 Fed. Reg. 33,422 (2000).

Prior to September 2003, the provisions of 38 C.F.R. § 4.71a, Diagnostic Code 5292 pertained to a limitation of thoracolumbar motion. A rating of 10 percent was warranted for a slight limitation of motion of the thoracolumbar spine; a 20 percent rating was warranted for a moderate limitation of the thoracolumbar spine; and a 40 percent rating was warranted for a severe limitation of the thoracolumbar spine. 38 C.F.R. § 4.71a, Diagnostic Code 5292 (2002).

Under Diagnostic Code 5289, favorable ankylosis of the thoracolumbar spine warranted a 40 percent disability rating, and unfavorable ankylosis warranted a 50 percent disability rating. 38 C.F.R. § 4.71a, Diagnostic Code 5289 (2002).

Additionally, under Diagnostic Code 5295, a 20 percent evaluation was warranted for lumbar strain with muscle spasm on extreme forward bending, loss of lateral spine motion, unilateral, in standing position. A 40 percent evaluation was warranted for severe lumbar strain; with listing of whole spine to opposite side, positive Goldthwaite's sign, marked limitation of forward bending in standing position, loss of lateral motion with osteo-arthritic changes, or narrowing or irregularity of joint space, or some of the above with abnormal mobility on forced motion. 38 C.F.R. § 4.71a, Diagnostic Code 5295 (2002).

Effective September 26, 2003, VA amended its Schedule for Rating Disabilities, to institute a general rating formula for evaluating diseases and injuries of the spine. Under the General Rating Formula, the regulations provide for a 10 percent rating when forward flexion of the thoracolumbar spine is greater than 60 degrees but not greater than 85 degrees; or combined range of motion of the thoracolumbar spine is greater than 120 degrees but not greater than 235 degrees; or muscle spasm, guarding or localized tenderness not resulting in abnormal gait or abnormal spinal contour or vertebral body fracture with loss of 50 percent or more of height. 38 C.F.R. § 4.71a (2016).

A 20 percent rating is assigned when forward flexion of the thoracolumbar spine is greater than 30 degrees, but not greater than 60 degrees, or the combined range of motion of the thoracolumbar spine is not greater than 120 degrees; or there is muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. Id.

A 40 percent rating is warranted if the medical evidence shows forward flexion of the thoracolumbar spine to 30 degrees or less; or favorable ankylosis of the entire thoracolumbar spine. Id.

A 50 percent rating is warranted if there is unfavorable ankylosis of the entire thoracolumbar spine. Id.

A 100 percent rating is warranted if there is unfavorable ankylosis of the entire spine. Id.

These ratings are warranted if the above-mentioned manifestations are present, with or without symptoms such as pain (whether or not it radiates), stiffness, or aching in the area of the spine affected by residuals of injury or disease. 38 C.F.R. § 4.71a, Diagnostic Codes 5235 to 5243 (2016).

Additionally, although a portion of the period for consideration occurs prior to the amendment and, therefore, requires only the application of the old criteria, as a portion this period occurs after September 26, 2003, the version of the Rating Schedule more that is more favorable to the Veteran applies from the time of the amendment. 

Reviewing the range of motion tests of record prior to March 9, 2012, the Veteran's worst range of motion reported was the day following her second post-service motor vehicle accident in 2006, with flexion to 45 degrees. Additionally, in the 2011 VA examination, the Veteran was shown to have muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis. Under the General Rating Formula for Diseases and Injuries of the Spine (new criteria), these results yield a 20 percent disability rating as there is no evidence of forward flexion of the thoracolumbar spine to 30 degrees or less. Similarly, under the old criteria, the Veteran would be in receipt of a 20 percent disability rating for moderate limitation of motion of the lumbar segment of the spine as there was no evidence of severe limitation of motion of the lumbar spine or severe lumbosacral strain, with listing of the whole spine to the opposite side, a positive Goldthwaite's sign, marked limitation of forward bending in a standing position, loss of lateral motion with osteoarthritic changes or narrowing or irregularity of the joint space. Other records prior to and after the 2006 treatment record during this time period reflect ranges of motion with flexion of 60 degrees or greater, thereby indicating an overall condition that is moderate at worst. Further, although there is a loss of lateral motion, there is no showing of osteoarthritic changes associated with the Veteran's condition. It is noted that arthritic changes were shown beginning in October 2006 after the Veteran's second post-service motor vehicle accident. However, these changes were later diagnosed in the 2011 VA examination as stable degenerative disc disease which, as discussed in further detail below, was later found to be medically attributed to intervertebral disc syndrome that was wholly unrelated to the Veteran's lumbar strain. Last, there were no showings of any ankylosis, severe lumbar strain with listing of the whole spine to the opposite side, a positive Goldthwaite's sign, or marked limitation of forward bending in a standing position during the period prior to March 9, 2012. Therefore, a the criteria for a 20 percent evaluation, but no higher, is supported by the medical evidence of record prior to March 9, 2012.

In reaching this conclusion, the Board has considered whether a higher disability evaluation is warranted on the basis of functional loss due to pain or due to weakness, fatigability, incoordination, or pain on movement of a joint under 38 C.F.R. §§ 4.40 and 4.45. See also DeLuca, 8 Vet. App. at 202. Functional loss contemplates the inability of the body to perform the normal working movements of the body with normal excursion, strength, speed, coordination and endurance, and must be manifested by adequate evidence of disabling pathology, especially when it is due to pain. 38 C.F.R. § 4.40. In this case, the VA examiners found specifically that range of motion in the Veteran's lumbar spine was limited by pain, but not by fatigue, weakness, lack of endurance, or incoordination. However, even then, pain on flexion only began at 45 degrees, well in excess of the 30 degrees that would be required for a higher rating. For the same reason a finding of severe limitation of motion of the lumbar spine is not warranted, even in contemplating functional limitation such as pain. 

The Board has considered whether staged ratings are warranted, but finds that they are not, as the evidence, including the Veteran's credible and probative statements, does not show that there are distinct periods of time where evaluations higher than a 20 percent evaluation prior to March 9, 2012, are warranted. The evidence of record does not warrant ratings in excess of those assigned for the lumbar strain at any time during the period pertinent to this appeal. 38 U.S.C.A. § 5110 (West 2014).

From March 9, 2012

Again, as this period occurs after September 26, 2003, the version of the Rating Schedule more favorable to the Veteran applies.

Effective in March 2012, the Veteran's rating for his lumbar strain was increased to 40 percent, based on findings made at a VA examination. 

At the March 2012 VA examination, the Veteran was diagnosed with lumbar degenerative joint disease and a lumbar disc problem. The Veteran complained of low back pain 8-9/10 radiating to left legs. The legs are weak and cannot go down steps. The Veteran had been using a cane for the last 2 years and was walking while holding things. She was not able to stand for more than 15 minutes, but could slowly walk hundreds of feet. She could not walk fast as legs would not go. She took oxycodone 1-2 times/day. The Veteran reported flare-ups that occur with weather changes. Range of motion revealed a flexion of 30 degrees, extension of 15 degrees, and bilateral lateral flexion and rotation of 20 degrees each, all ranges with pain at the end of motion. On repetition, flexion decreased to 25 degrees, with no additional pain. Functional limitation due to the lumbar spine included less movement than normal, weakened movement, pain on movement, disturbance of locomotion, and interference with sitting, standing, and/or weight bearing. There was localized tenderness to palpation of the lumbar spine and guarding or muscle spasm was severe enough to alter gait. Muscle strength testing showed active movement against some resistance in all groups. There was no atrophy and reflexes were all normal. Straight leg raising was positive bilaterally. There were no findings of radiculopathy or ankylosis. The examiner diagnosed the Veteran with intervertebral disc syndrome, but did not provide an opinion as to whether the condition was related to the low back strain. Imaging revealed the presence of arthritis that was attributed to the Veteran's discs, but not the lumbar strain itself.

The medical records from Dr. T. C. in August 2014 state that the Veteran suffered from chronic back pain for years which has prohibited her from living a normal lifestyle. It is noted that she has tried medication and physical therapy with no noticeable improvement in her back pain.

Treatment records from D. P., D.C. in August 2014 show that the Veteran reported having chronic back pain.

The Veteran was provided with an additional VA examination in December 2014. Based on a review of the claims folder, her reported history, and her examination, the examiner opined that the diagnosed intervertebral disc syndrome was less likely than not incurred in or caused by the claimed in-service injury, event or illness. The examiner stated that the claims file was reviewed, including service treatment records dated in September 1982, which listed episodic back ache after sprain in 1978. The Veteran served from 1978 to 1982. The reports of multiple outside doctors and VA Medical Center doctors, and multiple x-rays were reviewed. The examiner found that Veteran mainly had lumbar spondylosis at age 55 per most recent back imaging in 2010, which found a bulging disc at L5-S1 and the disc problem was found initially in 2006 after few car accidents (28 years after the Veteran had the initial back sprain) and lumbar spondylosis per x ray found also in 2009 at age 55. Therefore, the examiner opined that the back sprain which occurred in 1978 was less likely than not causing the intervertebral disc syndrome found in 2009, 28 years later, with a history of a few car accidents and currently with lumbar spondylosis and bulging of L5-S1. Further, a chiropractor diagnosed cervicalgia and lumbago in August 2014 and according to the Veteran's last visit to this provider, her mind was very clear, occasionally taking narcotics, but no epidurals or back surgery. It is noted the examiner did not see any reason why she "cannot sit or stand and cannot do sedentary work," as lots of people in society are working with spondylosis and disc bulging with cervicalgia and lumbago.

Medical records from Atlantic Pain Management & Rehabilitation indicates that the Veteran has been a patient since December 2014 for her chronic low back muscle strain with lumbar spondylosis and degenerative disc disease with radiculopathy.

The treatment records from VA Medical Center Hampton in January 2015 show complaints of low back pain. The records also indicate that the Veteran has received injections with no relief. Physical examinations revealed tenderness bilaterally of the lumbar paraspinal muscles and normal gait.

The Veteran was provided with an additional VA examination in June 2016. Upon a review of the Veteran's claims file, to include the previous VA examinations, the examiner found that it was less likely as not that the intervertebral disc syndrome was a continuation or progression of the low back strain; that it was less likely as not that the intervertebral disc syndrome was caused or aggravated by service; and, that the intervertebral disc syndrome was less likely as not caused or aggravated by the low back strain.

The Veteran was provided with a final VA examination in January 2017. Upon a review of the claims file, to include the previous VA examinations, the examiner opined that the Veteran's intervertebral disc syndrome was a separate and unrelated pathology from the lumbar strain.

The examiner cited medical literature that back sprains and strains are very common musculoskeletal injuries in people, primarily because the human spine is not designed to accommodate many modern activities and behaviors, such as playing sports, performing repetitive actions at work and sitting for prolonged periods of time. Whereas sprains are injuries to ligaments and joints, a strain is an injury to either muscles or tendons - the fibrous tissues that connect muscles to bones. The most commonly strained part of the spine is the lumbar (lower) region because of all the weight and force it must bear. Most back strains are self-healing, which can be sped up if one follows the at-home advice below. However, in some cases, professional treatment is necessary. 

Degenerative disc disease describes the natural breakdown of an intervertebral disc of the spine. Despite its name, degenerative disc disease is not considered a disease, nor is it progressively degenerative. On the contrary, disc degeneration is often the effect of natural daily stresses and minor injuries that cause spinal discs to gradually lose water as the annulus, or the rigid outer shell of a disc, weakens. As discs weaken and lose water, they begin to collapse. This can result in pressure being but on the nerves in the spinal column, causing pain and weakness.

Along with her history, the back with radicular symptoms occurred about 2010. Considering all facts, it is felt the back sprain and the degenerative disc disease appears as 2 separate pathologies. Furthermore, even her primary doctor from Atlantic Pain Management on June 2015 wrote that the Veteran had chronic low back muscle strain that is service-connected, lumbar spondylosis, degenerative disc disease, and lumbar radiculopathy. The diagnoses are related. The lumbar spondylosis /degenerative disc disease was not caused or aggravated by the chronic muscle strain. The primary doctor went on and said "she cannot sit or stand or walk any length of time, nor she cannot perform repetitive bending without aggravating her pain symptomatology. Furthermore, her memory and concentration have been impaired to the severity of her chronic pain. In my professional medical opinion the Veteran is unemployable. 

However, the VA examiner noted that, on the day of her VA examination in 2012, her mind was good considering she was 60 years old at the time. Further, she was not taking narcotics that affect her mind. Additionally, the pain for which she was taking the narcotics appears to be more secondary to her lumbar degenerative disc disease and degenerative joint disease than her lumbar strain. The examiner noted that this is likely the case because she has not been seen for pain management with complaints related to her back strain.

The VA examiner also noted that the Veteran's primary doctor also wrote an addendum on August 2015 stating that "the symptoms listed in my opinion that prevent employment are due to the service-connected and non service-connected back condition, but it is not possible to differentiates which symptoms are attributable to which pathology." The VA examiner stated that he feels the same and that it is not possible to differentiate what degree of pain due to what pathology. Once in pain, it is hard to say it is from muscle or the degenerative joint disease of the bone or the degenerative disc disease of the disc. Further, in regard to whether the back strain/sprain aggravates the degenerative disc disease or degenerative joint disease, the examiner opined that it may, but beyond the natural course of the disease process the examiner would say less likely than not because they are different tissues and different pathologies.

From March 9, 2012, the claims folder contains no other evidence of range of motion testing of the Veteran's lumbar spine. The Board notes that the claims folder also contains various private treatment records. However, such treatment records relate only to the Veteran's complaints of treatment for pain related to his lumbar spine.

During the period in question, the Veteran has not shown any evidence of ankylosis, which would be required for higher evaluations under both the old and new rating criteria. As such, these findings satisfy the highest rating criteria for limitation of motion of the lumbar spine under either version of the rating criteria; and the 40 percent rating based on these findings was correctly assigned. It is noted that where a musculoskeletal disability is currently evaluated at the highest schedular evaluation available based upon limitation of motion, a higher rating under 38 C.F.R. §§ 4.40, 4.45, and 4.59 is not warranted. See Johnston v. Brown, 10 Vet. App. 80 (1997). As such, these diagnostic codes will not specifically be discussed. 

The Board also considered whether a rating in excess of 40 percent could be assigned based on either incapacitating episodes of intervertebral disc syndrome or on neurologic symptoms. However, the examiner in 2014, 2016, and 2017 specifically found that the Veteran's intervertebral disc syndrome and associated symptoms were wholly unrelated to the service-connected lumbar strain, as they involved completely different parts of the musculoskeletal system, namely finding that the strain was a muscular disability sustained in service while the intervertebral disc syndrome affected the discs and developed much later after service, perhaps in response to multiple post-service motor vehicle accidents. Therefore, no further consideration is warranted based upon intervertebral disc syndrome.

Although some clinicians noted that the Veteran was most likely taking narcotics for her non service-connected intervertebral disc syndrome pain, they admitted it would be difficult to parse out which back condition was responsible for the pain. Therefore, in granting the benefit of the doubt, it is presumed that the narcotics were administered for the treatment of pain associated with the service-connected lumbar strain. Even if such is the case, the VA examiner found that the narcotics do not have an adverse effect on the Veteran's mind, as based upon his direct observation of her at the VA examination and the established medical knowledge of the effects of such drugs. As such, he found that the Veteran's condition would not adversely affect her employment.

As noted, a rating in excess of 40 percent may also be awarded for a lumbar spine disability if it causes unfavorable ankylosis. Ankylosis is defined as "immobility and consolidation of a joint due to disease, injury, surgical procedure." Lewis v. Derwinski, 3 Vet. App. 259 (1992) (citing Saunders Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health at 68 (4th ed. 1987)). In this case, the VA examiners all specifically found no indication of ankylosis. At all examinations during the course of his appeal, the Veteran was clearly able to move her lower back and it is, therefore, not ankylosed. A review of the Veteran's claims file does not show any finding of lumbar spine ankylosis during the course of her appeal. 

As such, the criteria for a schedular rating in excess 40 percent from March 9, 2012, have not been met.

The Board has considered whether staged ratings are warranted, but finds that they are not, as the evidence, including the Veteran's credible and probative statements, does not show that there are distinct periods of time where evaluations higher than a 40 percent evaluation at any time during the period of appeal are warranted. The evidence of record does not warrant ratings in excess of those assigned for the lumbar strain at any time during the period pertinent to this appeal. 38 U.S.C.A. § 5110 (West 2014).

The Board has considered the potential application of other various provisions, including 38 C.F.R. § 3.321(b)(1), for exceptional cases where schedular evaluations are found to be inadequate. See Schafrath v. Derwinski, 1 Vet. App. 589 (1991). Ordinarily, the VA Schedule will apply unless there are exceptional or unusual factors which would render application of the schedule impractical. See Fisher v. Principi, 4 Vet. App. 57, 60 (1993). According to the regulation, an extraschedular disability rating is warranted upon a finding that the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization that would render impractical the application of the regular schedular standards. See 38 C.F.R. § 3.321(b)(1) (2016); Fanning v. Brown, 4 Vet. App. 225, 229 (1993).

In Thun v. Peake, 22 Vet. App. 111, 115-16 (2008), the Court set forth a three-step inquiry for determining whether a veteran is entitled to an extraschedular rating. First, as a threshold issue, the Board must determine whether the veteran's disability picture is contemplated by the rating schedule. If so, the rating schedule is adequate and an extraschedular referral is not necessary. If, however, the veteran's disability level and symptomatology are not contemplated by the rating schedule, the Board must turn to the second step of the inquiry, that is whether the veteran's exceptional disability picture exhibits other related factors such as those provided by the regulation as "governing norms." These include marked interference with employment and frequent periods of hospitalization. Third, if the first and second steps are met, then the case must be referred to the VA Under Secretary for Benefits or the Director of the Compensation Service to determine whether, to accord justice, a veteran's disability picture requires the assignment of an extraschedular rating.

The evidence of record does not identify any factors which may be considered to be exceptional or unusual with respect to the Veteran's service-connected lumbar strain. There is no unusual clinical picture presented, nor is there any other factor which takes the disability outside the usual rating criteria. In particular, there are no medical findings that support the Veteran's contentions that medications taken for her lumbar spine disability have caused any interference with employment. Although, the Veteran is competent to describe the symptoms related to her lumbar spine disability and how the prescribed medication affects her, as such are within the realm of first-hand experience. The Board finds, however, that she is not competent to determine whether her symptoms render her unemployable. Rather, the evidence of record continues to show that the Veteran's effects of her lumbar spine disability are limited to the pain and loss of motion associated with it. The Veteran's functional impairment, including painful limitation of motion, is adequately contemplated by the rating criteria under Diagnostic Codes 5237(2016); or historically 5292, 5295 (2002). 

Here, the rating criteria reasonably capture the Veteran's symptoms including pain, weakness, and reduced motion. In this regard, for all musculoskeletal disabilities, the rating schedule contemplates functional loss, which may be manifested by, for example, decreased or abnormal excursion, strength, speed, coordination, or endurance. 38 C.F.R. § 4.40; Mitchell v. Shinseki, 25 Vet. App. 32, 37 (2011). For disabilities of the joints in particular, the rating schedule specifically contemplates factors such as weakened movement; excess fatigability; pain on movement; disturbance of locomotion; and interference with sitting, standing, and weight bearing. 38 C.F.R. §§ 4.45, 4.59; Mitchell, 25 Vet. App. at 37. In summary, the schedular criteria for musculoskeletal disabilities contemplate a wide variety of manifestations of functional loss, to include limitation of motion, decreased grip strength, etc. 

As the Veteran's disability picture is contemplated by the rating schedule, the threshold issue under Thun is not met and any further consideration of governing norms is not necessary, to include referral to the appropriate VA officials for extraschedular consideration.

In short, the evidence does not support the proposition that the Veteran's lumbar strain presents such an exceptional or unusual disability picture as to render impractical the application of the regular schedular standards and to warrant the assignment of an extraschedular rating under 38 C.F.R. § 3.321(b)(1). Thus, further consideration of extraschedular evaluations is not warranted in this case.

The Board notes that under Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014), a Veteran may be awarded an extraschedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual conditions fails to capture all the service-connected disabilities experienced. Here, however, the issue has not been argued by the Veteran or reasonably raised by the evidence of record. The Veteran has not asserted, and the evidence of record does not suggest, any such combined effect or collective impact of multiple service-connected disabilities that create such an exceptional circumstance to render the schedular rating criteria inadequate. Thus, there is neither allegation nor indication that the collective impact or combined effect of more than one service-connected disability presents an exceptional or unusual disability picture to render inadequate the schedular rating criteria, and the Board will therefore not address this issue further. See Yancy v. McDonald, 27 Vet. App. 484, 495 (2016).

TDIU

After reviewing the evidence of record, the Board has determined that the preponderance of the evidence is against the Veteran's claim for entitlement to a TDIU, to include on an extraschedular basis. 

As the Veteran's claim for an increased evaluation was filed in October 1990, and her TDIU claim was found to be inferred in accordance with the Court's holding in Rice v. Shinseki, 22 Vet. App. 447 (2009), the scope of for consideration begins from that time.

Initially, the Board notes that the Veteran is currently service connected for chronic low back strain at 20 percent disabling prior to March 9, 2012, and 40 percent thereafter, left lower extremity neurological symptoms at 10 percent from October 19, 2010, and right lower extremity neurological symptoms at 10 percent from October 19, 2010. The Veteran's combined evaluation is 20 percent from March 8, 1990, 40 percent from October 19, 2010, and 50 percent from March 9, 2012. Thus, the percentage requirements for a TDIU under 38 C.F.R. § 4.16(a) have not been met. Nonetheless, in exceptional circumstances, where the Veteran does not meet the aforementioned percentage requirements, a total rating may nonetheless be assigned, on an extraschedular basis, upon a showing that the individual is unable to secure and follow a substantially gainful occupation due to service-connected disabilities. 38 C.F.R. § 4.16(b). 

The central inquiry is "whether a veteran's service-connected disability alone is of sufficient severity to produce unemployability." See Hatlestad v. Brown, 5 Vet. App. 524, 529 (1993). Consideration may be given to a veteran's education, special training, and previous work experience, but not his age or the impairment caused by non-service connected disabilities. See 38 C.F.R. §§ 3.341, 4.16, 4.19 (2016); see also Van Hoose v. Brown, 4 Vet. App. 361 (1993). 

Considering the pertinent evidence detailed in the increased rating section above, the Board finds that the criteria for a TDIU are not met. Without the need to repeat the pertinent evidence outlined in the increased rating section above, the Board incorporates the discussion of evidence into this TDIU section

The Board acknowledges that the Veteran claimed in her 1996 Social and Industrial Survey to have been unemployed since she last worked at a department store in 1985. However, unemployed does not mean unemployable. 

A review of the medical evidence of record has shown that the Veteran is still capable of gainful employment even in light of her service-connected disabilities. 

Based on the above, the Board finds that the evidence does not show the Veteran to be incapable of performing the tasks that comport with her education and occupational experience. Her educational and occupational background, to include 4 years of high school, military training as a material control and accounting specialist as shown on her DD 214, and 2 years of technical college in secretarial sciences, as well as work as a clerk in a department store show that the Veteran is capable and suited for employment that would be more of a sedentary nature and not necessarily require significant physical requirements, such as prolonged standing and lifting. Additionally, it is noted that the medical evidence of record, to specifically include the findings of the VA examiners, shows that the Veteran's disabilities would not significantly interfere with sedentary employment, as there are many people in the current population who are able to work with the same types of disabilities. Although, it was indicated by the Veteran that narcotic medication taken for her back pain interferes with her mental ability, the VA examiners found that neither the medical literature, nor the Veteran's objective findings support such assertion. Additionally, as seen in the 2005 VA examination findings and the January 2006 private treatment letter, it appears that the Veteran has displayed some degree of symptom embellishment that may have exaggerated her perception that she is unable to work in any capacity.

Thus, a TDIU is not demonstrated by the record as the evidence of record fails to show that the Veteran is unemployable. 

The Board has considered whether the Veteran's claim should be referred to the Director of Compensation Service for consideration of entitlement to a TDIU on an extraschedular basis under 38 C.F.R. § 4.16(b). When there is plausible evidence that a Veteran is unable to secure and follow a substantially gainful occupation, without any affirmative evidence to the contrary, a Veteran's case is eligible for consideration under 38 C.F.R. § 4.16(b) by referral to the Director Compensation Service. For the reasons discussed above, the criteria for referral have not been met as the preponderance of the evidence is against the Veteran's claim for a TDIU on an extraschedular basis. 

As the evidence fails to establish that the Veteran's service-connected disabilities preclude substantially gainful employment, the criteria for a TDIU are not met, and the claim must be denied. In reaching this conclusion, the Board has considered the applicability of the benefit-of-the-doubt doctrine. However, as the preponderance of the evidence is against the claim for a TDIU, that doctrine is not applicable. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102.


ORDER

Entitlement to a disability rating in excess of 20 percent, prior to March 9, 2012, and in excess of 40 percent thereafter, for service-connected lumbar strain is denied.

Entitlement to a TDIU is denied.



____________________________________________
H.M. WALKER
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs